# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF MISSISSIPPI
# DELTA DIVISION

**SECURITIES AND EXCHANGE COMMISSION**                             **PLAINTIFF**

**VS.**                                         **CIVIL ACTION NO. 2:08CV-0206-WAP-DAS**

**STEPHEN M. STRAUSS**                                               **DEFENDANT**

## MEMORANDUM OPINION AND ORDER

Before the court is Plaintiff Securities and Exchange Commission's ("SEC") Motion for Default Judgment Against Defendant Stephen M. Strauss, pursuant to Rule 55 of the *Federal Rules of Civil Procedure*. The undersigned, having duly considered the motion and being fully apprised in the premises, hereby finds as follows:

On September 25, 2008, the SEC filed a complaint against Strauss alleging he violated Section 10(b) of the Exchange Act, 15 U.S.C. § 77j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b5. Specifically, the complaint alleges that Strauss had fraudulently inflated the market price for shares of Chilmark Entertainment Group, Inc. ("Chilmark") by issuing six false and misleading press releases. Strauss was served with a copy of the complaint on October 7, 2008, and his responsive pleading was due no later than October 27, 2008. On November 6, 2008, the SEC filed an application for entry of default against Strauss (# 6), and on November 7, 2008, the clerk, after reviewing the Application for Entry of Default and supporting Affidavit, filed an Entry of Default against Defendant Strauss (# 8). The SEC filed the instant motion for default judgment (# 14) on August 23, 2010.

Securing a default judgment is a three-step procedure involving the defendant's default, entry of default, and a default judgment. *New York Life Ins. Co. v. Brown*, 84 F.3d 137, 141 (5th Cir.1996). A "default" occurs when the defendant does not plead or otherwise respond to the

complaint, and an entry of default is the notation the clerk makes after the default is established by affidavit. *Id.* After the entry of default by the clerk, a party may seek a default judgment from the court. FED. R. CIV. P. 55(b)(2). In this case, the procedural requirements for default judgment have been satisfied. Now, the court must evaluate the SEC's complaint and satisfy itself that "[t]here [is] a sufficient basis in the pleadings for the judgment." *Nishimatsu Const. Co., Ltd. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir.1975). That said, by virtue of his default, the defendant has admitted the plaintiff's well-pleaded allegations of fact. *See id. See also Geddes v. United Fin. Group*, 559 F.2d 557, 560 (9th Cir.1977) (stating "[t]he general rule of law is that upon default the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true"). Thus, only if the complaint provides a sufficient basis for the relief it seeks can the court enter a default judgment and grant relief in the plaintiff's favor.

## I. Allegations of the Complaint

From 2002 until early 2007, Defendant Stephen M. Strauss was the Chief Executive Officer and Chairman of the Board of Directors of Chilmark Entertainment Group, Inc. ("Chilmark"), a publicly traded company. Chilmark was a corporation headquartered in Southaven, Mississippi. Strauss and his family members owned approximately 208,714 Chilmark shares during the relevant time period, or nine percent of the total shares outstanding.

In early November 2006, Chilmark announced its intention to acquire Integrated Bio-Energy Resources, Inc. ("Integrated"), an unrelated company that was not publicly traded. Integrated was purportedly in the business of manufacturing biofuel from palm oil. In November and December 2006, Strauss artificially inflated the price and volume of the trading in Chilmark stock by

2

publishing a series of six false and misleading press releases about Integrated. The press releases were disseminated over the internet, in English and Spanish, through services including Market News Publishing, Inc., PR Newswire, PR Newswire Europe, The Associated Press, Knobias.com, and Investrend. Because Chilmark announced the merger with Integrated at the beginning of the series of press releases, all of the misrepresentations regarding Integrated impacted the market for Chilmark shares. In the press releases, Strauss claimed that Integrated was on the verge of manufacturing biofuel from palm oil. In actuality, however, when Strauss issued the press releases, neither Chilmark nor Integrated had secured any funding, purchased the land to build a refinery, or begun building the refinery to manufacture the biofuel.

*False Statements*

1. November 1, 2006 Release

On November 1, 2006, Strauss issued a press release on behalf of Chilmark, announcing that Chilmark had acquired Integrated. The press release stated: "Integrated Bio-Energy is a consortium of Palm Oil Growers who have pooled their assets with the assistance of various Caribbean Governments to produce Bio-Gasoline and Bio-Diesel. A refinery the company currently has under construction is anticipated to have the capacity to produce 1 million barrels per week of Bio-Fuel." The claim that Integrated had a refinery under construction at the time of the release was false and/or misleading. Moreover, Strauss lacked a reasonable basis to project that the refinery could produce one million barrels of biofuel per week. At the time of the press release, there were no definitive plans in place to build a particular refinery, and thus it was virtually impossible to project any particular production capacity. Strauss knew that the claim that Integrated had a refinery under construction with the specified capabilities was false and/or misleading, or was reckless in not so

3

knowing.

2. November 3, 2006 Release

On November 3, 2006, Strauss issued a press release on behalf of Chilmark announcing that, as part of its agreement with Integrated, Chilmark had sold all of its music assets, including artist contracts, music licensing agreements, and Chilmark's music library, to Zoomoozik, LLC. The release went on to state:

> Chilmark Entertainment Group, Inc. as a part of their [sic] agreement with Integrated Bio-Energy Resources has also spun out the remaining assets and liabilities into a private company Chilmark Music, Inc. The assets are the 50% ownership in Video B Gone, LLC, [and] the financial interest the company has in See More Golf, LLC. The liabilities will be paid as part of the agreement with Integrated Bio-Energy Resources by January 15, 2007. The entire entity will therefore be Integrated Bio-Energy Resources with approximately $5,000,000 in net assets and less then [sic] $125,000.00 in liability [sic].

The claim that Integrated would have approximately $5,000,000 in net assets and less than $125,000 in liabilities by January 15, 2007 was false because neither Chilmark nor Integrated had assets at the time of the November 3, 2006 press release that would have enabled the two of them, after merging, to have approximately $5,000,000 in net assets and less than $125,000 in liabilities by January 2007. As Chilmark's sole officer, Strauss was intimately familiar with its financial situation. Having negotiated the merger with Integrated, Strauss also had the opportunity to learn about Integrated's financial situation. Strauss either knew that the claim concerning the assets and liabilities Integrated Bio-Energy Resources would have in January 2007 was false or misleading at the time that he made it, or was reckless in not so knowing.

3. November 21, 2006 Release

On November 21, 2006, Strauss issued a press release on behalf of Chilmark and Integrated, announcing that the latter company's management had returned from meetings in the Caribbean and

4

South America. The release stated that: "[t]he meetings were designed to finalize plans with the governments, palm growers and engineers that are all part of the team that will realize the goal of making Bio-Diesel Fuel from the abundant palm oil resources in the region." The November 21, 2006 release quoted Integrated CEO and President Scott Wagman as stating: "The meetings couldn't have gone better and we are definitely on track to be in Bio Fuel production by third quarter 2007. We will have many more releases in the next few days that will more fully explain out totally integrated plan to be the regions [sic] largest Bio Diesel Fuel producer."

The claim that Integrated was "definitely on track to be in Bio Fuel production by third quarter 2007" was false. At the time, Integrated had not acquired the land on which to build a refinery, begun building the refinery or even secured the requisite financing to fund the purchase of the land or the refinery. Strauss knew that the claim in the November 21, 2006 press release that Integrated was "definitely on track to be in Bio Fuel production by third quarter 2007" was false and/or misleading at the time that he made it, or was reckless in not so knowing. Strauss had no reasonable basis for making that projection.

4. November 27, 2006 Release

On November 27, 2006, Strauss issued, on behalf of Chilmark and Integrated, a press release stating"

> Scott Wagman CEO and President – Integrated Bio-Energy Resources, Inc. [] announced today as a result of the Company's trip to the Caricom region that the Company has entered into an agreement to immediately purchase a 25% interest in 6,000 acres of palm oil farms. The 6,00 acres are part of a 400,000 acre tract designated by the governments of the region for palm oil farming for Bio-Diesel Fuel. Upon completion of the building of the first plant and refinery, the additional 75% will be owned by Integrated. The agreement allows for the balance of the 400,000 acres to be purchased as production requirements are needed to meet the operational needs of the refineries [sic] capacities. The Company plans to manage the entire process from farming through refining to control the quality and the price

5

> of the refined Bio-Diesel fuel. This is one of the first steps in our plan to work closely with the governments and the growers in the region so that we can produce our goal of over 3 million gallons of Bio-Diesel fuel per day by the year 2012.

The claim that Integrated had entered into an agreement to purchase a 25% interest in 6,000 acres of palm oil farms was false.

The purported agreement was not actually entered into until later, on December 6, 2006. Moreover, even when it was finalized, the agreement was preliminary in nature and was not an agreement to purchase a parcel of land as described in the press release. Strauss knew that the claim that Integrated had entered into an agreement to purchase a 25% interest in 6,000 acres of palm oil farms was false at the time that he made it, or was reckless in not knowing that the claim was false because he had no reasonable basis for the claim.

     5. November 29, 2006 Release

On November 29, 2006, Strauss issued, on behalf of Chilmark and Integrated, a press release stating:

> Integrated Bio-Energy Resources, Inc. [] announced today that the company will own and operate two refineries in the Caricom region by the 3rd quarter of 2008. The first refinery with a capacity of 2,000,000 gallons of Bio-Diesel fuel monthly and [sic] is slated and be completed by the third quarter of 2007. A larger custom-built refinery that will be located in a different part of the region with a capacity of 240 million gallons annually is slated for opening in the 3rd quarter of 2008. The Company on its recent trip to the region met with several Government officials and potential buyers of the Bio-Diesel fuel who have expressed their intent to place pre-purchase orders in support of the project as soon as they come on line.

Strauss' claim that Integrated would own two refineries with the capabilities specified in the release by the third quarter of 2008 was false and misleading because at the time of the press release, Integrated had not begun construction of the refineries or even secured the requisite financing to fund that construction. Integrated has never obtained the financing required to proceed with the

6

construction of these refineries. Strauss knew at the time of the press release that the claim that Integrated would own two refineries with the capabilities specified in the release by the third quarter of 2008 was false and misleading, or was reckless in not so knowing.

  6. December 11, 2006 Release

On December 11, 2006, Strauss issued another press release on behalf of Chilmark and Integrated, announcing that Integrated had secured a signed agreement with the government of Guyana. In relevant part, the press release stated that:

> The agreement provides for the commencement of farming and the creation of the first plant and refinery. As part of the plan, Integrated will have a 100 acre parcel with Atlantic Ocean access for the building of the first plant and refinery. Bio-Energy officials will return to Guyana accompanied by the engineering team within the first two weeks of January to begin the project.

Strauss' claims concerning Integrated's agreement with Guyana were false, and he had no reasonable basis for making them. A Memorandum of Understanding ("MOU") between Integrated and certain Guyanese government officials was executed on December 6, 2006. However, the MOU was not an agreement to sell land and did not specify any purchase price or lease amount. Instead, the MOU specified certain conditions that Integrated had to meet before the Guyanese government would "make available for lease or purchase" arable land that could be used to grow palm oil fruit. The MOU required Integrated to provide the Guyanese officials with a feasibility plan and its corporate financials; Integrated did not fulfill either condition.

The press releases created the erroneous impression that Chilmark had already merged with Integrated, that the merged companies had significant assets, and that they were on the verge of beginning a large bio-fuel production venture. Chilmark actually had no substantial assets or business. Thus, the misstatements would have led a reasonable investor to believe Chilmark shares

7

were worth far more than they actually were.

The price and trading volume for Chilmark shares jumped dramatically in response to Strauss' false and misleading press releases. For example, on October 30 and 31, 2006, the daily trading volume for Chilmark shares averaged 715 shares and the price closed at $0.01 per share. On November 1, 2006, the day of the first press release, the trading volume spiked to 1.8 million and Chilmark shares closed at $0.15 per share. The subsequent press releases sustained the artificially high price and trading volume for Chilmark shares. Between November 1, 2006 and December 11, 2006, the date of the last press release, the daily trading volume averaged 267,600 shares and the price closed as high as $0.22 per share. In contrast, during the three months prior to these press releases, the daily trading volume for Chilmark's shares averaged only 13,600 shares and the price never closed above $0.01 per share.

Chilmark and Integrated were ultimately combined in March 2007, when Integrated executed a reverse merger with Chilmark. At that point, Chilmark changed its name to Integrated and Integrated began to be quoted on the Pink Sheets under the stock symbol "IBIE." Around the time of the merger, Strauss resigned his positions as Chairman and CEO and Integrated's management assumed control of the company.

## II. Applicable Law

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b)[1], and Rule 10b-

---

[1]Section 10(b) states that it is

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the

8

5 promulgated thereunder, 17 C.F.R. § 240.10b-5[2], prohibit material misstatements or omissions in connection with the purchase or sale of securities. *See SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968); *United States v. Naftalin*, 441 U.S. 768, 777-78 (1979). Courts have regularly concluded that information in press releases are sufficiently connected with the purchase or sale of securities because investors regularly rely on that information when buying securities. *See, e.g., Plotkin v. IP Axess Inc.*, 407 F.3d 690, 697 (5th Cir. 2005); *SEC v. Softpoint*, 958 F.Supp. 846, 862 (S.D.N.Y. 1997). Projections of future performance may be actionable under Section 10(b) and Rule 10b-5 "if they are worded as guarantees or are supported by specific statements of fact . . . or if the speaker does not genuinely or reasonably believe them." *Kowal v. IBM Corp.*, 163 F.3d 102, 107 (2d Cir. 1998).

Section 10(b) and Rule 10b-5 violations require proof that the defendant acted with scienter. *See Central Laborers' Pension Fund v. Integrated Elec. Services Inc.*, 497 F.3d 546, 551 (5th Cir. 2007) (citation omitted). Scienter is a mental state that embraces an intent to deceive, manipulate or defraud, and includes severe recklessness. *See Nathenson v. Zonagen Inc.*, 267 F.3d 400, 408 (5th

---

protection of investors.

[2]Rule 10b-5 states that it is unlawful

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

Cir. 2001). Severe recklessness is

> limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Integrated*, 497 F.3d at 551. (citation omitted). Scienter may be established for violations of Section 10(b) by showing that defendants made representations to investors "without basis and in reckless disregard of their truth or falsity." *SEC v. Kenton Capital, Ltd.*, 69 F. Supp.2d 1, 10 (D.D.C. 1998).

A misrepresentation is material when it "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available ." *Rosenzweig v. Azuriz Corp.*, 332 F.3d 854, 865-66 (5th Cir. 2003) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)). Information relating to a company's financial condition and profitability generally is material. *See First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1318 (5th Cir. 1977). Also, information that would affect the probable future of the company and which may affect an investor's desire to buy, sell, or hold the company's securities is material. *See Texas Gulf Sulphur*, 401 F.2d at 849.

Strauss violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by issuing false press releases. Strauss acted with the requisite scienter because he knowingly and/or recklessly disseminated false and misleading information to investors and potential investors. The press releases created the erroneous impression that Chilmark had already merged with Integrated, that the merged companies had significant assets, and that they were on the verge of beginning a large bio-fuel production venture. Chilmark actually had no substantial assets or business. Thus, the

10

misrepresentations would have led a reasonable investor to believe Chilmark shares were worth far more than they actually were. While all the press releases were part of a pattern of fraudulent behavior, the market appears to have deemed the misrepresentations made in three of the releases material as the stock price and trading volume increased significantly after they were issued.[3]

Based on the foregoing, the court is convinced that entry of judgment against Strauss for violations of Section 10(b) and Rule 10b-5 is appropriate.

### III. Relief

The SEC seeks the following remedies: a permanent injunction against future violations of the securities laws; an officer and director bar; disgorgement of ill-gotten gains, including prejudgment interest; and a civil monetary penalty. A district court has "broad equitable power to fashion appropriate remedies" upon finding a violation of federal securities laws. *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996).

A. Permanent Injunction and Officer/Director Bar

The SEC seeks a permanent injunction enjoining Strauss from violating, directly or indirectly, Section 10(b) of the Exchange Act and Rule 10b-5. "Section 20(b) of the Securities Act of 1933, 15 U.S.C. § 77t(b), and § 21(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u(d), authorize the Commission to seek and direct the courts to enter permanent restraining orders upon a 'proper showing' that the defendant 'is engaged or is about to engage' in violations of the securities laws." *See SEC v. Zale Corp.*, 650 F.2d 718, 720 (5th Cir. 1981). A defendant's past violation of the securities laws alone is insufficient to support permanent injunctive relief. *Id*.

---

[3] Nevwest Securities "Statement of Account" documents for Chilmark Media indicate that the relevant sales of Chilmark stock took place between November 22, 2006 and December 5, 2006.

11

Instead, the court must determine whether the defendant's past conduct gives rise to an inference that, in light of present circumstances, there is a "'reasonable likelihood' of future transgressions." *Id.* In imposing a permanent injunction, courts consider a number of factors, including the (1) egregiousness of the defendant's conduct, (2) isolated or recurrent nature of the violation, (3) the degree of scienter, (4) sincerity of defendant's recognition of his transgression, and (5) likelihood of the defendant's job providing opportunities for future violations. *SEC v. Gann* 565 F.3d 932, 940 (5th Cir. 2009) (citing *SEC v. Blatt*, 583 F.2d 1325, 1334 n. 29 (5th Cir. 1978)).

The SEC also seeks an officer and director bar. Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] authorizes a court in a Commission enforcement action to bar or suspend a person from serving as an officer or director of a public company "if the person's conduct demonstrates unfitness to serve" in that capacity. 15 U.S.C. §§ 77t(e) and 78u(d)(2). Courts generally consider some of the same factors noted above when making such a determination: (1) the egregiousness of the securities law violations, (2) the likelihood that the misconduct will recur, (3) the defendant's role or position when he engaged in the fraud, (4) the degree of scienter, (5) the defendant's economic stake in the violation, and (6) defendant's repeat offender status. *See, SEC v. Patel*, 61 F.3d 137, 141 (2nd Cir. 1995).[4] Moreover, where a lifetime bar is sought, courts should weigh the "loss of livelihood and the stigma attached to the permanent exclusion from the corporate suite" against the likelihood of future misconduct. *Id.* at 142.

The court finds that a permanent injunction against future violations is warranted under the circumstances of this case. Strauss was CEO and Chairman of the Board of Directors of Chilmark

---

[4]*Patel* was decided before Congress changed the standard for obtaining an O&D bar from "substantial unfitness" to "unfitness." Courts, however, continue to apply the *Patel* factors. *See, e.g., SEC v. Global Telecom Servs., LLC*, 325 F. Supp.2d 94, 121 (D. Conn. 2004).

12

and played a central role in the violation. Indeed, during his deposition Strauss admitted that he authored all six of the press releases at issue.[5] Most importantly, however, Strauss repeatedly and knowingly and/or recklessly defrauded investors by disseminating false and misleading information. During his deposition, Strauss admitted that his main concern was letting investors know that Chilmark had a "real" deal going and admitted that the releases "were a little off." And, while it is not apparent whether Strauss' current employment will provide opportunities for future violations, the court finds this factor is not determinative. *Zale*, 650 F.2d at 721 (recognizing that a change in occupation, without more, will not provide a complete defense to an injunction).

For the same reasons noted above, the court finds that Strauss is unfit to serve as an officer or director of a publicly held company. It is clear to the court from reading Mr. Strauss' deposition testimony that as CEO of Chilmark he lacked an understanding of the heightened requirements for publicly traded companies and failed to exercise due diligence and caution in executing his responsibilities. Nevertheless, the court is of the opinion that a permanent prohibition is not warranted and that a five (5) year bar from acting as an officer or director of a public company will serve as a sufficient deterrent. *See Patel*, 61 F.3d at 142 (discussing the importance of specific findings establishing the likelihood of future misconduct when imposing a lifetime ban).

B. Disgorgement and Prejudgment Interest

A federal district court has broad discretion whether to order disgorgement and to determine the amount of the award. *See SEC v. AMX, Int'l, Inc.*, 7 F.3d 71, 73 (5th Cir. 1993). *See also SEC v. Manor Nursing Ctr., Inc.*, 458 F.2d 1082, 1104 (2d Cir. 1972) (asserting deterrent effect of an SEC enforcement action would be greatly undermined if securities law violators were not required

---

[5]The SEC deposed Strauss in connection with its investigation of this case on December 5, 2007.

to disgorge illicit proceeds). The purpose of disgorgement is to deprive the wrongdoer of his ill-gotten gains and deter future violations of the law. *AMX*, 7 F.3d at 76 n. 8. "The court's power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing." *Blatt*, 583 F.2d at 1335. If the Commission shows a causal relationship between the defendant's wrongdoing and the amount by which he was unjustly enriched, that amount of money may be disgorged. *See SEC v. Banner Fund Int'l*, 211 F.3d 602, 617 (D.C. Cir. 2000). Because such calculations are "not capable of exactitude," any "risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty." *Patel*, 61 F.3d at 140 (quoting *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989)).

Between November 1, 2006 and December 11, 2006, Strauss manipulated the market for shares of Chilmark by disseminating false and misleading information in a series of six press releases. As a result, the price of Chilmark shares increased from $0.01 to a high of $0.22. Strauss has testified that in addition to his role as Chairman and CEO of Chilmark, he also was the Managing Director and only employee of Chilmark Media Ltd., an affiliated entity. Chilmark Media maintained a securities account with Nevwest Securities Corporation. As of October 31, 2006, the only asset in that account was 2,800,000 shares of Chilmark Entertainment Group, valued at a price per share of $0.01. By November 30, 2006, the price per share had increased to $0.21. Between November 11, 2006 and December 5, 2006, Chilmark Media sold 317,000 shares of Chilmark Entertainment, resulting in total proceeds of $56,184.78.

On December 6, 2006, the day after the last sale of Chilmark stock by Chilmark Media, Strauss opened an account in Chilmark Media's name at Bank of America. On December 8, 2006, $56,169.22 was wired from Chilmark Media's Nevwest Securities account to Bank of America

14

Account Number 003786611642. The amount transferred consisted of the proceeds from the sale of 317,000 shares of Chilmark, which totaled $56,184.78, plus $9.44 in interest minus the $25 wire fee charge. The only authorized signatory on Chilmark Media's account with Bank of America is Mr. Strauss. Chilmark Media's securities and bank account documents submitted by the Commission show that the total disgorgement amount against Strauss is $56,169.22. The court finds this amount is appropriate.

Courts may add prejudgment interest to the disgorgement amount to prevent a defendant benefitting from the use of his ill-gotten gains interest free. *Blatt,* 583 F.2d at 1335. The SEC has calculated prejudgment interest on the disgorgement in accordance with the delinquent tax rate established by the Internal Revenue Service, IRC § 6621(a)(2), and assessed on a quarterly basis. Generally, prejudgment interest is calculated at the IRS delinquent tax rate because it "reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant received from its fraud." *First Jersey*, 101 F.3d at 1476. The court finds prejudgment interest at the IRS delinquent tax rate is appropriate. Accordingly, the court directs the SEC to calculate the prejudgment interest owed on $56,169.22 for the period of December 8, 2006 through the date of this opinion.

C. Civil Penalties

The SEC also seeks a civil penalty against Strauss pursuant to Section 20(d) of the Securities Act and Section 21(d)(3)(A) of the Exchange Act [15 U.S.C. § 78u(d)(3)(A)], which provide that the Commission may seek and the court may impose civil penalties.[6] The statutes provide for three

---

[6] Tiered penalties must be adjusted for inflation. 17 C.F.R. § 201.1003, Adjustment of civil monetary penalties – 2005. 70 FR 7607. The penalty amounts sought by the SEC have been adjusted for inflation.

tiers of penalties. First tier penalties for any violation (arising from the majority of the conduct that as here, occurred after February 1, 2001) may be imposed up to the larger of $6,500 for a natural person or $60,000 for any other person, or the amount of ill-gotten gain. *See* 15 U.S.C. § 78u(d)(3)(B)(i). When the violation involves "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," second tier penalties may be imposed up to $60,000 for a natural person or $300,000 for any other person, or the amount of the ill-gotten gain. *See* 15 U.S.C. § 78u(d)(3)(B)(ii). A third tier civil penalty of up to the larger of $120,000 for a natural person or $600,000 for any other person, or the amount of ill-gotten gain may be imposed when any provision of the Securities Act or the Exchange Act is violated, if the violation involved fraud or deceit and the violation resulted in substantial losses or created a significant risk of substantial losses to other persons. 15 U.S.C. § 78u(d)(3)(B)(iii). The SEC suggests that Strauss' actions qualify for a second tier penalty, and the court agrees. The SEC has shown that misrepresentations in three of the offending press releases were material. Thus, the court is of the opinion that a second-tier civil monetary penalty of $5,000 per press release, or $15,000 is appropriate.[7]

**THEREFORE, IT IS ORDERED:**

1. That the plaintiff's Motion for Default Judgment (# 14) is hereby **GRANTED**; and

2. That the plaintiff shall submit a proposed final judgment in accordance with the Opinion of the court within ten (10) days of this date.

---

[7]The SEC has not argued nor presented a basis for a more severe penalty.

THIS 28th day of March, 2011.

                                                  /s/ W. Allen Pepper, Jr.
                                                  W. ALLEN PEPPER, JR.
                                                  UNITED STATES DISTRICT JUDGE